PEOPLE v HURST (AFTER REMAND)

Docket No. 84939. Submitted March 15, 1988, at Lansing. Decided
June 7, 1988.

Charles A. Hurst was convicted of two counts of first-degree
criminal sexual conduct following a bench trial in Recorder's
Court of Detroit. The trial court, Michael J. Talbot, J., sen-
tenced defendant to two concurrent prison terms of from forty
to eighty years. Defendant appealed. The Court of Appeals
affirmed the convictions, but vacated defendant's sentences and
remanded to the trial court for an evidentiary hearing and
resentencing, with particular focus upon the question of the
typical sentence that would actually be served under a lengthy
term of years such as was imposed and compared with the
typical sentence actually served under a life sentence. The
Court of Appeals retained jurisdiction. 155 Mich App 573
(1986). Following the evidentiary hearing on remand, the trial
court, Michael J. Talbot, J., sentenced defendant to concurrent
life sentences.

After remand, the Court of Appeals *held:*

The life sentences imposed by the trial court in this case on
remand do not shock the conscience of the Court of Appeals.

Affirmed.

*Frank J. Kelley,* Attorney General, *Louis J.
Caruso,* Solicitor General, *John D. O'Hair,* Prose-
cuting Attorney, *Timothy A. Baughman,* Deputy
Chief, Civil and Appeals, and *Denise Green,* Assis-
tant Prosecuting Attorney, for the people.

*Gerald S. Surowiec,* for defendant on appeal.

AFTER REMAND

Before: M. J. KELLY, P.J., and SHEPHERD and C. W. SIMON,* JJ.

M. J. KELLY, P.J. We previously affirmed defendant's convictions on two counts of first-degree criminal sexual conduct, MCL 750.520b(1)(e); MSA 28.788(2)(1)(e); however, we vacated defendant's concurrent sentences of prison terms of from forty to eighty years and remanded this case to the trial court for an evidentiary hearing and resentencing, while retaining jurisdiction. See *People v Hurst,* 155 Mich App 573; 400 NW2d 685 (1986). As noted in the first opinion, the sentencing guidelines recommended a minimum sentence range of prison terms of from ten to twenty years.

The concern that prompted remand was whether a person given a lengthy indeterminate sentence for a Proposal B violation was significantly worse off for purposes of parole consideration than a person given a life sentence for the same crime. If so, then the forty-year minimum imposed would shock our conscience. We noted that defendant here was convicted of Proposal B offenses which carry maximum sentences of life imprisonment. The "Lifer Law" provides a carrot. It gives the parole board authority and jurisdiction to release the prisoner, subject to certain conditions, after serving ten calendar years.[1] Proposal B provides that inmates serving indeterminate sentences for any one of the eighty crimes listed in the statute

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] MCL 791.234(4); MSA 28.2304(4) provides:

A prisoner under sentence for life or for a term of years, other than prisoners sentenced for life in the first degree and prisoners sentenced for life or for a minimum term of imprisonment for a major controlled substance offense, who

remain ineligible for parole until the minimum sentence, less disciplinary credit, is served. MCL 791.233b; MSA 28.2303(3). See also *People v Johnson,* 421 Mich 494, 498; 364 NW2d 654 (1984).

On remand, commencing July 17, 1987, the trial court conducted the evidentiary hearing mandated by our decision of October 21, 1986, 155 Mich App 573.

At the evidentiary hearing William J. Hudson, an employee of the Michigan Department of Corrections and Chairman of the Michigan Parole Board, testified. He stated that his duties included administration of the parole board, but primarily

has served 10 calendar years of the sentence is subject to the jurisdiction of the parole board and may be released on parole by the parole board, subject to the following conditions:

(a) One member of the parole board shall interview the prisoner at the conclusion of 4 calendar years of the sentence and biennially thereafter until such time as the prisoner is paroled, discharged, or deceased.

(b) A parole shall not be granted a prisoner so sentenced until after a public hearing held in the manner prescribed for pardons and commutations in sections 44(d) to 44(f) and 45. Notice of the public hearing shall be given to the sentencing judge or the judge's successor in office, and parole shall not be granted if the sentencing judge, or the judge's successor in office, files written objections to the granting of the parole within 30 days of receipt of the notice of hearing. The written objections shall be made part of the prisoner's file.

(c) A parole granted under this subsection shall be for a period of not less than 4 years and subject to the usual rules pertaining to paroles granted by the parole board. A parole ordered under this subsection shall not become valid until the transcript of the record is filed with the attorney general whose certification of receipt of the transcript shall be returnable to the office of the parole board within 5 days. Except for medical records protected by section 2157 of Act No. 236 of the Public Acts of 1961, being section 600.2157 of the Michigan Compiled Laws, the file of a prisoner granted a parole under this subsection shall be a public record.

(d) A parole shall not be granted under this subsection in the case of a prisoner who is otherwise prohibited by law from parole consideration. In such cases the interview procedures in section 44 shall be followed.

he was concerned with matters of parole and indeterminate sentences.

Using the example of defendant, a person convicted of criminal sexual conduct and sentenced to from forty to eighty years imprisonment, Hudson testified that the parole board calculates a potential minimum date and an actual minimum date. Similarly it calculates a potential maximum date and an actual maximum date. Given a forty-year minimum sentence, with the application of the maximum disciplinary credits that are available to be awarded, defendant had a potential minimum sentence of thirty-two years and six months. The potential maximum sentence, based on an eighty-year actual maximum, was calculated to be approximately sixty-four years imprisonment.

Mr. Hudson testified that, although the Prison Overcrowding Emergency Powers Act, MCL 800.71 et seq.; MSA 28.1437(1) et seq., had not yet played a role in defendant's sentence, if the Governor were to invoke the act, the potential minimum sentence would be reduced by ninety days, reducing the potential minimum to thirty-two years and three months. Subsequent invocation of the act would also reduce the potential minimum by ninety days on each occasion.

Asked whether an inmate is generally paroled the first time the calculated release date is reached, Hudson testified that, although that was generally the public's perception, in reality it was not the case. He stated that the primary consideration at that point was the risk the inmate might pose to society. Other considerations included the nature and circumstances of the offense, prior history and overall institutional adjustment.

When asked to compare this example to that of someone given a life sentence for a Proposal B violation, Hudson testified that he did not think a

person given a life sentence under these circumstances was ever "eligible" for parole in the same manner as a person given an indeterminate sentence. Falling within the jurisdiction of the parole board does not translate to "eligibility" unless all conditions are fulfilled. He stated that such an inmate only falls within the jurisdiction of the parole board after serving ten calendar years in prison. He stated that the first hurdle was that the parole board must be in favor of parole. Next, there must be a public hearing. Finally, if the sentencing judge or successor judge files written objections, the inmate serving a life sentence remains ineligible for parole. Hudson emphasized that, so long as the sentencing judge or successor judge objects, the person can never be released on parole.

Chairman Hudson described the public's misconception about the distinction between a parole board interview and actual parole consideration. Each inmate, whether serving a life sentence or an indeterminate sentence for a Proposal B crime, is interviewed by the parole board at the end of the first four years imprisonment and then every other year thereafter.[2] Hudson stated that it was error to equate the interview procedure with eligibility for parole and that inmates were interviewed although not eligible for parole consideration.[3] He emphasized that an inmate with a life

---

[2] MCL 791.234(4)(a); MSA 28.2304(4)(a).

[3] The procedure was mandated by the Legislature from considerations not altogether clear to the parole board and apparently not endorsed by its chairman. At the conclusion of direct and cross-examination the chairman got a few things off his chest:

> *The Court:* Anything else?
> Thank you Mr. Chairman.
> *The Witness:* I would like to discuss it further sometime or even now, Judge Talbot and I don't want to infringe on you and

counsel, and Mr Hurst certainly, because he is a kind of a spinoff of anything I would like to say, except there is a lot of confusion and that part of it is understandable. But, I think it does not need to be confusing and when people quote newspapers and reports of newspapers, then I think we only add to the confusion.

In fact, in the opinion, I take no argument with the Appellate Court, but you know, they don't have it right, they don't have the information correct. There may be good arguments that they haven't included, but in this one, they even included they didn't read it far enough, they included the schedule of good time, the old good time application rather than disciplinary credits.

The law does not, footnote two, that schedule is provided is good time credit, that's not . . . .

*The Court:* We haven't used that.

*The Witness:* We used it some.

*The Court:* For the other fellows applicable.

*The Witness:* Right, but it doesn't apply to Mr. Hurst and never did. His is disciplinary credits, in fact, it's seven days per month. So, I think it's unfortunate and counsel mentioned the article on seven years and I don't know if he specifically is referring to April 1st, 1986, but there was something put out by the Justice Department that said in Michigan the average life sentence was seven years and they cited 24 cases. I almost drove off the expressway when I heard it on WJR because I knew it wasn't true. So, when I got back I specifically asked who are they talking about and in fact, 15 of these 24 have been transferred to mental or medical facilities. Four had died while in prison in less than seven years one had been transferred to a Federal institution and three had been paroled.

So the point I was trying to make and I have three cases in my hand and those—of those three that were released, the average of those released, I think this has to be underscored of those released, of those three was 16 years, that is only of those that were released now.

So, I think we need to, I guess I am asking also, Judge, to have some greater communications and have a feeling that yours is not as much confusion as some others, but there is a lot of things, there is a lot of information that somehow, we are doing something different and I think it was when the Legislature put the interview schedule in that immediately became consideration, and never was intended.

In fact, the Lifer Law hasn't changed for forty years and it's an excellent piece of legislation.

I think it truly allows the offended [sic] to be reconsidered at a later date, it allows the Board to make some decisions and yet, the Court always maintains jurisdiction in that kind of a case and I strongly support it and I hope that it never changes. I guess I would like to get it back so we can interview by policy rather than interviewing because my experience is if you

sentence for a Proposal B crime was "not eligible for parole until such time as there has been a public hearing and a sentencing or successor judge has not filed written objections."

Hudson went on to testify that in 1985 there were a total of nine prisoners serving life sentences for crimes other than first-degree murder or major controlled substance offenses who were released on parole. Hudson estimated that during that same year there were between seven hundred and one thousand inmates serving similar life sentences.

Chairman Hudson was also asked to compare the effect of Proposal B on various indeterminate sentences. His response may be summarized in the tabular form as follows:

| TERM MIN/MAX | BEST MINIMUM OUT BEFORE PROPOSAL B | BEST MINIMUM OUT AFTER PROPOSAL B |
|---|---|---|
| 10-20 | 6 yrs., 4 mos., 27 days | 8 yrs., 1 mo., 14 days |
| 20-30 | 10 yrs., 8 mos., 25 days | 16 yrs., 2 mo., 29 days |
| 40-80 | 15 yrs., 11 mo., 33 days [sic] | 32 yrs., 6 mo., 3 days |
| 150-300 | Approx. 51 yrs. | 120 yrs. |

Chairman Hudson took exception to the statement on page 578 of our original opinion in this matter (155 Mich App 578) concerning computation of disciplinary credits. He correctly pointed out that our footnote 2 quoted the subsection related to good time credits and not disciplinary

sentence a person to a [sic] 150 years and I have to interview them in four years, he doesn't want to hear what I have got to say and in fact, he won't talk to me anyway, because he is very much involved in the appellate process, depending on the age, maybe you are having some significant adjustment problems and so on, but I don't intend to lecture. But I came down here for several reasons, not only in Mr. Hurst [sic] and that's all.

credits. We erred. We should have cited MCL 800.33(5); MSA 28.1403(5).

Chairman Hudson opined that there is the potential that someone given a life sentence for a Proposal B violation could be eligible for parole in ten years. When compared with an indeterminate sentence of forty to eighty years, the comparison showed:

> I think the big—the difference and the thing that you have to remember is that even with the 40 to 80, while the time is substantial, that that person must serve, there does come a time even on the 80 when that person would discharge, that means would walk out the door with no control of the department or anybody else for that matter, whereas the life sentence, as long as the sentencing Court or his successor file written objections, that person could never be released.

We are not willing to chalk up an unqualified plus. For any meaningful analysis the sentencer would be expected to factor in the prisoner's age. Hudson had already testified that an eighty-year maximum could be reduced to sixty-four years if, and only if, all favorable sentence reduction possibilities came about.

Moreover, as he also stated, prisoners given indeterminate sentences for Proposal B violations, such as defendant, are not considered for parole after serving the first ten years of their sentence. They remain ineligible for parole consideration until their potential minimum sentence is served.

Hudson seemed of the opinion that, depending on the sentencing judge, the person with a long indeterminate sentence for a Proposal B violation is potentially much better off in terms of eligibility for parole than is the person serving life for a Proposal B violation. But large double digit sen-

tences eclipse the light at the end of the tunnel. Hurst was born September 24, 1957, making him twenty-seven years old at the time of his original sentence. With a forty-year Proposal B minimum, less 166 days jail credit, his earliest out date would be May 2, 2017. Hudson stated that many more inmates probably serve a life sentence "than are ever released under a life sentence." However, since there is as yet no Proposal B lifer who has been released, since none have served ten years, Hudson said there are no figures available on the average Proposal B lifer term of imprisonment.[4] With all the uncertainties inherent in the game, and knowing that only He who tossed the ball onto the field knows the outcome,[5] we think life is the better alternative.

Subsequently, the trial court resentenced defendant on August 7, 1987. The sentencing judge stated:

So, therefore, sir, for the purpose of punishment and to protect society from you and since you already have a prior Armed Robbery conviction and since you have a Criminal Sexual Conduct, First Degree, two counts, let's not lose sight of that fact, conviction.

It is the sentence of this Court, you be committed to the Department of Correction and placed in the custody of the State Prison, Southern Michi-

---

[4] As the sentencing judge retains the key to the jailhouse door under MCL 791.234(4)(b); MSA 28.2304(4)(b), the prisoner perforce takes his chances on the quality of mercy being strained or not. But time works on the adamant too.

[5]    The Ball no question makes of ayes and noes
But Here or There, as strikes the Player, goes;
and He that tossed it down onto the Field,
He knows about it all—He knows—HE knows!

Omar Khayyam, *The Rubaiyat,* stanza 70, translated by Edward Fitzgerald.

gan in the hopes of rehabilitation, to protect society from you and utilization of the whole factors, life imprisonment.

In light of the concerns enunciated here and in our previous opinion we view these as sentences which do not shock our conscience.

Affirmed