GILMORE v PAROLE BOARD
VARGAS v PAROLE BOARD
CESPEDES v PAROLE BOARD

Docket Nos. 217199, 221566, 228376. Submitted August 7, 2001, at Detroit. Decided August 21, 2001, at 9:05 A.M. Leave to appeal sought.

Wayne Gilmore, Martin Vargas, and Merquiades N. Cespedes, prisoners serving parolable life sentences, were each informed by the Parole Board after receiving a statutorily mandated interview by a board member pursuant to MCL 791.234(6)(a) that the board had "no interest in taking further action." The board did not give a written explanation for its decision in each case. Gilmore sought judicial review of the board's decision in the Wayne Circuit Court. The court, Louis F. Simmons, Jr., J., granted leave to appeal and remanded the matter to the Parole Board for a written explanation of the reasons for "the denial of parole." The Parole Board appealed to the Court of Appeals by leave granted. (Docket No. 217199). Vargas sought leave to appeal in the Saginaw Circuit Court. The court, Leopold P. Borrello, J., denied leave to appeal. Vargas appealed to the Court of Appeals by leave granted. (Docket No. 221566). Cespedes sought leave to appeal in the Wayne Circuit Court. The court, William J. Giovan, J., granted leave to appeal and remanded the matter to the Parole Board for an articulation of the reasons for its decision. The Parole Board appealed to the Court of Appeals by leave granted. (Docket No. 228376). The appeals were consolidated.

The Court of Appeals *held*:

An inmate serving a parolable life sentence is not entitled to a written explanation for the Parole Board's decision of "no interest" in taking further action after the prisoner's statutorily mandated interview pursuant to MCL 791.234(6)(a). The Parole Board's decision of "no interest" is not reviewable by the circuit court. An inmate serving a parolable life sentence is entitled to a written explanation under MCL 791.235(12) only after the inmate has been interviewed and has received a notice indicating interest in taking further action, has avoided a judicial veto, and has proceeded through a public hearing to the ultimate decision of the Parole Board. Only the ultimate decision to grant or deny parole of an

inmate serving a parolable life sentence is appealable. The considerations found in MCL 791.234(8) pertaining to determining whether a prisoner convicted of violating or conspiring to violate MCL 333.7401(2)(a)(i) and sentenced to imprisonment for life before October 1, 1998, as was Cespedes, is to be released on parole need not be made until after the prisoner has proceeded through the parole eligibility process to the point where the Parole Board makes the final determination regarding the release of the prisoner. The courts' grants of leave to appeal and remands for written explanations with regard to Gilmore and Cespedes must be reversed. The court's denial of leave to appeal with regard to Vargas must be affirmed.

Reversed with regard to Docket No. 217199.

Affirmed with regard to Docket No. 221566.

Reversed with regard to Docket No. 228376.

1. Sentences — Parolable Life Terms — Parole Board Interviews — Appeal — Written Explanations.

Notice by the Parole Board to a prisoner serving a parolable term of life imprisonment that the board, after one of its members interviewed the prisoner, has "no interest" in taking action toward the prisoner's release does not constitute a decision that is subject to judicial review and is not a decision for which the prisoner is entitled to a written explanation; a written explanation is required only after the prisoner has been interviewed and received a notice indicating interest in taking further action, has avoided a judicial veto, and has proceeded through a public hearing to the ultimate decision of the Parole Board, and only the ultimate decision is appealable (MCL 791.234, 791.235).

2. Sentences — Controlled Substances — Parole.

The statutory factors to be considered in determining whether a prisoner convicted of violating or conspiring to violate MCL 333.7401(2)(a)(i) and sentenced to imprisonment for life before October 1, 1998, is to be released on parole need not be made until after the prisoner has proceeded through the parole eligibility process to the point where the Parole Board makes the final determination regarding the release of the prisoner (MCL 791.234[8]).

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Charles C. Schettler, Jr.*, Assistant Attorney General, for the Parole Board.

*Stuart G. Friedman*, for Wayne Gilmore.

*R. Steven Whalen*, for Martin Vargas.

*Laura K. Sutton*, for Merquiades N. Cespedes.

Before: SAAD, P.J., and HOEKSTRA and SMOLENSKI, JJ.

HOEKSTRA, J. In these consolidated appeals, petitioners are all prisoners serving parolable life sentences for unrelated criminal convictions. Common in these appeals are the questions whether, in light of *Glover v Parole Bd*, 460 Mich 511; 596 NW2d 598 (1999), and *In re Parole of Johnson*, 235 Mich App 21; 596 NW2d 202 (1999), an inmate serving a parolable life sentence is entitled to a written explanation for the Parole Board's decision of "no interest" in taking further action after the prisoner's statutorily mandated interview pursuant to MCL 791.234(6)(a) and whether the Parole Board's decision of "no interest" is reviewable by the circuit court. We answer both questions in the negative.

## I. FACTS AND PROCEEDINGS BELOW

### A. *GILMORE v PAROLE BOARD*

In 1978, a jury convicted Wayne Gilmore of second-degree murder for aiding and abetting a murder and the trial court sentenced him to life imprisonment with the possibility of parole. Following his conviction and sentencing, Gilmore testified for the prosecution both at a trial and a retrial against the trigger-man and an accomplice, despite the risk of personal danger to which testifying exposed him.

The record reveals a criminal history before Gilmore's second-degree murder conviction, including multiple convictions and multiple arrests without con-

victions. At the time of the current offense, Gilmore was on parole for a previous conviction. While in prison for the current conviction, Gilmore incurred at least ten "major misconducts" and was involved in a fraudulent telephone-use scam; however, during his years of incarceration he has completed his GED and other educational programs, maintained employment in the resident store as an inmate storekeeper, and received positive reports for his involvement in a number of activities including, e.g., sports, educational programs, and occupational programs. A 1997 psychological evaluation report indicates that the risk of his engaging in future assaultive behavior is low.

At issue here is the Parole Board's August 8, 1997, decision that states that after Gilmore's most recent interview, "the majority of the Parole Board has no interest in taking action at this time." The decision does not explain why the Parole Board came to this conclusion. On March 18, 1998, Gilmore filed a petition for judicial review seeking review and reversal of the Parole Board's decision on the bases that the Parole Board failed to articulate reasons justifying its decision, which denied Gilmore due process, and that the Parole Board abused its discretion in not permitting the case to proceed to a public hearing. The circuit court granted an appeal, finding that it has appellate jurisdiction over the matter, and remanded the matter to the Parole Board for a written explanation of the reasons for "the denial of a parole." On January 6, 1999, relying on *In re Parole of Glover*, 226 Mich App 655; 575 NW2d 772 (1997),[1] the circuit court

---

[1] The Supreme Court affirmed in part, reversed in part, and remanded with regard to our opinion in *Glover*, 460 Mich 511; 596 NW2d 598 (1999).

found that Gilmore has a liberty interest in the parole process that requires the Parole Board to state reasons for not scheduling him for a public hearing. Although, initially, this Court denied the Parole Board's application for leave to appeal the circuit court's decision, we later granted rehearing and leave to appeal.

### B. *VARGAS v PAROLE BOARD*

In 1972, a jury convicted Martin Vargas of raping a seventeen-year-old female. The trial court sentenced him to life imprisonment with the possibility of parole.

The record reveals that Vargas had no criminal history before the instant offense. While in prison for the current conviction, Vargas incurred several "misconducts" and a "major misconduct." However, Vargas completed his GED, obtained an associate's degree and a bachelor of arts degree, in addition to completing other classes. He maintained employment in various prison positions, received letters of appreciation for certain acts, such as providing artwork for a volunteer appreciation banquet, for designing a book cover for health care, and for translating materials into Spanish. He is an artist and he donated paintings to be sold at a benefit for victims of Hurricane Mitch. Vargas received commendations when he came to the aid of a staff member being assaulted by another inmate and when he came to the assistance of a prisoner attempting suicide. Vargas has a supportive extended family and a wife whom he married while in prison. Vargas completed sex offender therapy and received treatment from prison psychologists. According to one psychologist, Vargas "continues to

hold to the position that he is innocent of the kidnapping, rape and robbery of the complainant," but, despite this information, the psychologist opined that Vargas "poses a low risk or [sic] danger to the community."

Despite the Parole Board's March 27, 1992, unanimous vote to proceed with a public hearing, after the 1992 legislative reorganization of the Parole Board, an equally divided newly constituted Parole Board voted "no interest" in proceeding with a public hearing, despite a positive recommendation by the Parole Board member who interviewed Vargas. Thereafter, another Parole Board member met Vargas when Vargas was translating for another inmate during an interview and changed her mind after this meeting. Subsequently, the Parole Board voted unanimously to proceed to a public hearing. However, the plan for a public hearing was halted when, on October 28, 1993, Saginaw Circuit Court Judge Robert Kaczmarek objected to paroling Vargas. Vargas appealed this denial of parole consideration up to the Michigan Supreme Court.

Meanwhile, five years had passed since the 1993 action, and in 1998, Vargas was again interviewed by a Parole Board member and received a favorable recommendation. Despite the favorable recommendation, an April 20, 1998, decision indicated that the Parole Board had "no interest in taking action at this time." But, on June 16, 1998, our Supreme Court, noting that Judge Kaczmarek had been disqualified from the case as of October 17, 1991, and thus was no longer the successor judge, remanded the case to the Saginaw Circuit Court judge properly assigned to Vargas' case and directed him to "review the Parole

Board's intent to hold a public hearing on the petitioner's parole, examine the information as to the offense and offender, and decide whether to file a written objection within 30 days of this order." The Supreme Court retained jurisdiction. On remand, Saginaw Circuit Court Judge Leopold P. Borrello found "no reason to object to a public hearing by the Parole Board." Thereafter, in lieu of granting leave to appeal, the Supreme Court remanded the matter to the Parole Board for another parole release interview and directed that Judge Kaczmarek's written objection to parole release be stricken from Vargas' file and replaced with the opinion of the successor judge.

In compliance with the Supreme Court's order, the Parole Board chairperson interviewed Vargas. In a March 5, 1999, decision, the Parole Board stated that after "your most recent interview, the majority of the Parole Board has no interest in taking action at this time." The decision further states that "[f]ollowing an interview and review of this case, the Parole Board does not have interest [in] proceeding to a public hearing at this time." The decision does not explain why the Parole Board came to this conclusion.

On April 13, 1999, Vargas filed an application for leave to appeal to the circuit court, seeking review and reversal of the Parole Board's decision. Relying heavily on *Johnson*, the circuit court determined that Vargas had never reached the point where he was "eligible" for parole because the Parole Board terminated the parole process at the preliminary stage of deciding whether to conduct a public hearing. Thus, the circuit court denied leave to appeal the decision of the Parole Board. Vargas appeals this order by leave granted.

After a nonjury trial in 1982, the trial court convicted Merquiades Cespedes of possession with intent to deliver more than 650 grams of cocaine, apparently for his involvement as a doorman during a drug deal. The trial court sentenced Cespedes to life imprisonment.[2]

Cespedes had a criminal history before the instant drug conviction, including previous drug charges as well as unspecified convictions. Although Cespedes received "major misconducts" during his imprisonment and attempted an escape, the record also reveals that he received his GED and completed numerous other educational classes, served as a teacher's aide for a bilingual education program, and maintained membership in organizations such as the United States Jaycees and Jaycees International. Further, the record reveals that Cespedes accepts full responsibility for his drug law violation and is sincere in remorse. The record further reveals that he has remained married throughout his imprisonment and his wife, son, and daughter continue to support him.

After a March 1, 1999, interview, the Parole Board issued a notice of action stating that "[b]ased upon the seriousness of the offense, the large amount of cocaine seized, and your institutional conduct, the Parole Board takes no interest in parole at this time." On appeal, the circuit court determined that Cespedes

---

[2] At the time Cespedes was convicted and sentenced, possession with intent to deliver more than 650 grams of cocaine, MCL 333.7401(2)(a)(i), required imposition of a nonparolable life sentence, and thus Cespedes was sentenced to imprisonment for "natural life without parole." However, in 1998, the Legislature amended the law to allow parole in certain circumstances. See 1998 PA 314 and *infra*, n 19.

was denied parole and it remanded the matter to the Parole Board for an articulation of reasons. The Parole Board appeals from the circuit court's decision by leave granted.

## II. STANDARD OF REVIEW

The issues in these cases involve questions of law, including statutory interpretation and parole eligibility, that are reviewed de novo. *People v Webb*, 458 Mich 265, 274; 580 NW2d 884 (1998); *In re Parole of Bivings*, 242 Mich App 363, 368; 619 NW2d 163 (2000); *In re Parole of Johnson, supra* at 22-23. In *Sun Valley Foods Co v Ward*, 460 Mich 230; 596 NW2d 119 (1999), our Supreme Court summarized the rules of statutory interpretation:

> The rules of statutory construction are well established. The foremost rule, and our primary task in construing a statute, is to discern and give effect to the intent of the Legislature. This task begins by examining the language of the statute itself. The words of a statute provide "the most reliable evidence of its intent . . . ." If the language of the statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written. No further judicial construction is required or permitted. Only where the statutory language is ambiguous may a court properly go beyond the words of the statute to ascertain legislative intent.
>
> In interpreting the statute at issue, we consider both the plain meaning of the critical word or phrase as well as "its placement and purpose in the statutory scheme." As far as possible, effect should be given to every phrase, clause, and word in the statute. The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended. [*Id.* at 236-237 (citations omitted).]

III. OVERVIEW

To reiterate, the common issues in these appeals are (1) whether an inmate serving a parolable life sentence is entitled to a written explanation for the Parole Board's decision of "no interest" in taking further action after the prisoner's statutorily mandated interview, MCL 791.234(6)(a), and (2) whether the Parole Board's decision of "no interest" is reviewable by the circuit court. Resolution of these issues depends on whether our Supreme Court's decision in *Glover* implicitly overrules this Court's decision in *Johnson*. Having studied *Glover* and *Johnson*, we conclude that *Johnson* remains good law. Accordingly, we hold that an inmate serving a parolable life sentence is entitled to a written explanation only after the inmate has been interviewed and has received a notice indicating interest in taking further action, has avoided a judicial veto, and has proceeded through a public hearing to the ultimate decision of the Parole Board. Further, because we conclude that *Glover* does not implicitly overrule *Johnson*, this Court is bound by the *Johnson* decision,[3] which holds that a Parole Board decision of "no action" after conducting a lifer interview is not appealable.

IV. ARGUMENTS PRESENTED

The prisoners herein make the following arguments.[4] The prisoners are entitled to a written explanation of the Parole Board's determination of "no

---

[3] See MCR 7.215(I)(1).

[4] Although each prisoner in these consolidated appeals presents separate arguments on appeal, we combine their arguments here for ease in addressing them.

interest" in taking further action after the prisoner's statutorily mandated interview by a member of the Parole Board. *Glover* clearly held that MCL 791.235 gives lifers the right to a statement of reasons for adverse Parole Board decisions. Further, the "no interest" decision is a final order, an adverse decision, and a decision denying parole, and the decision of "no interest" is appealable. To the extent that *Johnson* holds otherwise, it was overruled by *Glover*. *Glover* is controlling and nothing in that case ties the right to appeal to the fact that a public hearing took place. Rather, *Glover* held that subsection 34(8), MCL 791.234(8), creates judicial review rights with respect to all adverse parole decisions, and the decision not to proceed to a public hearing is an adverse parole decision.

In contrast, the Parole Board argues that "a lifer is only denied parole when he or she has avoided a judicial veto, has had a public hearing, and has been denied parole after a vote by the entire Parole Board." Further, a Parole Board's notice of action declining interest in proceeding to a public hearing is not a final decision of the Parole Board that is appealable to or reviewable by the circuit court. According to the Parole Board, *Johnson* was correctly decided, and *Glover* is distinguishable from *Johnson* because the prisoner in *Glover* had been granted a public hearing and the Parole Board had issued its final decision. Furthermore, the *Glover* Court made no mention of overruling *Johnson*, and those two decisions are capable of harmonious interpretation. Moreover, the history of paroles in Michigan makes it clear that the taking of no further action after an interview does not constitute a denial of parole. The Parole Board fur-

ther argues that MCL 791.235 does not apply to prisoners serving a life sentence. According to the Parole Board, the amendments made to the statutory provisions dealing with parole demonstrate that the Legislature did not intend to give inmates serving a life sentence a right to receive a written explanation for the decision not to advance them to a public hearing.

### V. THE LAW IN QUESTION

#### A. THE STATUTORY SCHEME

Our Legislature has created a statutory scheme addressing parole eligibility. MCL 791.234 (§ 34) governs the Parole Board's jurisdiction and MCL 791.235 (§ 35) governs parole interviews. *Glover, supra* at 523. Within this statutory scheme, there is a distinction between the parole process for those prisoners serving indeterminate sentences and for those prisoners serving parolable life sentences; however, there are also provisions applying to both categories of prisoners. See *id.* at 523, n 18. The significance of the statutory provisions dealing with the process during which inmates serving parolable life sentences are considered for possible parole, MCL 791.234(6), is aptly explained by the *Johnson* Court:

Subsection 6 . . . provides that a person serving a parolable life sentence "is subject to the jurisdiction of the parole board" after serving either ten or fifteen years, depending on when the crime was committed, "subject to" certain enumerated "conditions." MCL 791.234(6); MSA 28.2304(6). This subsection, however, "simply means that a defendant will be eligible for review by the parole board" after serving ten or fifteen years, not that the defendant will be released. See *People v Legree*, 177 Mich App 134, 141; 441 NW2d 433 (1989); see also *People v Lino (After Re-*

*mand)*, 213 Mich App 89, 96-97; 539 NW2d 545 (1995) (because of the many conditions imposed by the statute, persons sentenced to life in prison are rarely paroled after ten years), overruled on other grounds by *People v Carson*, 220 Mich App 662, 673-674; 560 NW2d 657 (1996).

All prisoners covered by subsection 6 "shall" be interviewed by a member of the Parole Board after serving ten years, and every five years thereafter, without regard to sentencing date. MCL 791.234(6)(a); MSA 28.2304(6)(a). Thus, "inmates are interviewed although not eligible for parole consideration." *People v Hurst (After Remand)*, 169 Mich App 160, 164; 425 NW2d 752 (1988). The Parole Board then decides whether to "take action" toward paroling the prisoner.

However, even if the board votes to consider a prisoner for parole after the initial interview, the statute provides that "parole shall not be granted . . . until after a public hearing [is] held . . . ." MCL 791.234(6)(b); MSA 28.2304(6)(b). Although a hearing is clearly required, this Court has held that the Parole Board cannot be compelled to hold one. *Middleton v Parole Bd (On Remand)*, 208 Mich App 563, 566-568; 528 NW2d 791 (1995).

Notice of the hearing must be given to the sentencing judge or the judge's successor. MCL 791.234(6)(b); MSA 28.2304(6)(b). The statute further provides that "parole shall not be granted if the sentencing judge, or the judge's successor in office, files [timely] written objections to the granting of the parole . . . ." MCL 791.234(6)(b); MSA 28.2304(6)(b).

· "[A] prisoner's release on parole is *discretionary* with the parole board." See MCL 791.234(6)(d), (7); MSA 28.2304(6)(d), (7) (emphasis added); see also *In re Parole of Glover*, 226 Mich App 655, 664-665; 575 NW2d 772 (1997), lv gtd 458 Mich 866 (1998). The board's discretion is circumscribed by regulations issued by the Department of Corrections. See 1996 AACS, R 791.7701 *et seq.* [*Johnson, supra* at 23-25.]

The *Johnson* Court also addressed the statutory provision regarding appealability:

Finally, "[t]he action of the parole board in *granting or denying* parole is appealable by the prisoner, the prosecutor of the county from which the prisoner was committed, or the victim of the crime for which the prisoner was convicted." MCL 791.234(7); MSA 28.2304(7) (emphasis added). The board's decision is reviewed for abuse of discretion. *In re Parole of Roberts,* 232 Mich App 253, 257-258; 591 NW2d 259 (1998). Appeals are only by leave of court. MCL 791.234(7); MSA 28.2304(7). [*Johnson, supra* at 25.]

In conjunction with provisions of § 34, § 35 "sets forth an inmate's rights during the interview process and details, among other things, the permissible considerations at the interview, the right to advance notice of the interview, and the right to representation at the interview." *Glover, supra* at 523. Subsection 35(12) provides that "[w]hen the parole board makes a final determination not to release a prisoner, the prisoner shall be provided with a written explanation of the reason for denial and, if appropriate, specific recommendations for corrective action the prisoner may take to facilitate release."

The interpretation and application of some of the provisions in §§ 34 and 35 are at issue in the present cases, and in order to resolve the questions presented, we must first determine whether our Supreme Court's decision in *Glover* implicitly overruled this Court's decision in *Johnson.* Thus, a synopsis of those cases follows.

### B. *In re PAROLE OF JOHNSON*

The appellant in *Johnson,* an inmate serving a parolable life sentence since 1980 for second-degree murder, received a letter after a member of the Parole Board interviewed him in 1996 that indicated

that a majority of the Parole Board had "no interest in taking action" toward his release and that in the future he would be interviewed again as required by law. *Johnson, supra* at 22. The appellant appealed this decision by leave granted, and the circuit court found that he was ineligible for parole and that the "no action" letter was not an appealable decision denying him parole. *Id.* This Court granted leave to appeal. *Id.*

Noting that parole eligibility is governed by statute, see MCL 791.234, the *Johnson* Court explained that "it is clear that, for a person to be eligible for parole *within the meaning of the applicable statute,* several legal hurdles must be overcome." *Johnson, supra* at 23 (emphasis in original). Those hurdles include the Parole Board's decision whether to "take action" toward paroling the prisoner after a member of the board interviews the prisoner, the avoidance of a judicial objection by the sentencing judge or that judge's successor, a public hearing, and the discretionary decision of the Parole Board whether to release the prisoner. *Id.* at 24-25. Citing subsection 34(6), the *Johnson* Court summarized, "under the statute, a prisoner is not truly 'eligible' for parole until each and every one of the statutory 'conditions' has been met; otherwise, parole 'shall not' be granted." *Id.* at 25. Finally, it is the action of the Parole Board in *granting or denying* parole that is appealable by leave of the circuit court. *Id.*

With regard to appealability, the *Johnson* Court concluded:

> We are also convinced that only the Parole Board's ultimate decision to grant or deny parole is appealable. We note that the statute unequivocally forbids the granting of

> parole to any prisoner who fails to overcome any of the statutory hurdles. See MCL 791.234(6); MSA 28.2304(6); see also [*People v*] *Hurst* [*(After Remand)*, 169 Mich App 160, 164; 425 NW2d 752 (1988)]. Until all the statutory conditions are met, the Parole Board lacks the discretion to parole a prisoner. An appeal from any such failure would be futile because the statute clearly predetermines the outcome: "parole shall not be granted" to any prisoner—such as plaintiff—who does not overcome the interview, hearing, and objection hurdles. See MCL 791.234(6); MSA 28.2304(6). [*Johnson, supra* at 25-26.]

Under this reasoning, the *Johnson* Court concluded "that the trial court correctly refused to review the Parole Board's decision to take no action in appellant's case." *Id.* at 26.

### C. *GLOVER v PAROLE BOARD*

The facts in *Glover* are distinct from those in *Johnson*. In *Glover*, the appellant, after having served in prison eighteen years of her three concurrent parolable life sentences, the Parole Board voted to proceed to a public hearing and the successor judge filed no written objection. *Glover, supra* at 514. At the public hearing, supporters of the appellant gave testimony urging that the Parole Board grant parole, whereas relatives and friends of the victims and community members opposed parole. *Id.* at 514-515. When the hearing concluded, the chairperson of the Parole Board indicated that " 'we wouldn't be here if it wasn't close' " and that the Parole Board would have to weigh the information before it. *Id.* at 516.

Months later, the Parole Board issued a notice of action declining to grant parole that stated:

"After full consideration of the positions taken by those testifying at the public hearing and consideration of the adjustment, attitude and behavior of the prisoner, the parole board withdraws interest in proceeding toward parole at this time. You will next be interviewed by the parole board five years from your most recent interview as indicated in the official date above." [*Id.* at 516.]

The appellant sought judicial review of this denial of parole with the circuit court, arguing, among other things, that the Parole Board failed to provide a sufficiently detailed statement explaining its decision to deny her parole. *Id.* As noted by the Supreme Court, after the circuit court rejected the appellant's claims, this Court granted leave to appeal and found the Parole Board's explanation for denying the appellant parole inadequate, *id.* at 516, stating that the limited reason given by the Parole Board did not pass " 'federal or state due process constitutional muster.' " *Id.* at 517, quoting 226 Mich App 668-669, n 3. The Supreme Court noted that this Court held that while no statute required the Parole Board to provide a written explanation for its decision to deny parole, nevertheless, the appellant had a right under the federal and state Due Process Clauses to a written explanation of why she had been denied parole. *Glover, supra* at 517.

Having granted leave to appeal,[5] the Michigan Supreme Court identified the primary issue as whether the appellant "is entitled to a written explanation of the reason the [P]arole [B]oard denied her request for parole." *Id.* at 518. The Supreme Court noted that after exercising its discretion to grant or

---

[5]   458 Mich 867 (1998).

deny parole, the Parole Board was required under MCL 791.234(8)[6] to provide a sufficient explanation for its decision, thereby allowing meaningful appellate review. *Glover, supra* at 519. Concluding that the Parole Board's limited explanation was inadequate, the Supreme Court determined that this Court "rightly decided that the board had 'abjured any meaningful explanation,'" and the remand by the Court of Appeals was within its authority, but that the justification cited for the remand was in error. *Id.,* quoting 226 Mich App 668, n 3.

The Supreme Court reversed this Court's ruling that the appellant's federal due process rights were violated because "[t]he United States Supreme Court is the final arbiter regarding the meaning of the federal constitution" and its majority opinion in *Greenholtz v Inmates of Nebraska Penal & Correctional Complex,* 442 US 1; 99 S Ct 2100; 60 L Ed 2d 668 (1979), held: "'That the state holds out the *possibility* of parole provides no more than a mere hope that the benefit will be obtained . . . a hope which is not protected by due process.'" *Glover, supra* at 520-521, quoting *Greenholtz, supra* at 11. Recognizing that a court is "free to find that an individual has greater rights under a Michigan constitutional provision than under its federal counterpart when compelling reasons to do so exist," the Supreme Court declined to consider such an argument because statutory grounds existed to affirm this Court's decision to remand the matter to the Parole Board. *Glover, supra* at 522.

---

[6] "[Subsection] 34(8) provides that an inmate's release on parole is discretionary with the parole board, but is also appealable to the circuit court." *Glover, supra* at 519, n 12. The provisions in that subsection are currently found in subsection 34(9), as amended. See 1999 PA 191.

Next, the Supreme Court addressed the statutory right to a written explanation of a Parole Board decision. The Court agreed with the appellant's argument that Michigan parole statutes mandate that the Parole Board provide a petitioner a written explanation of its decision. *Id.* at 522-523. In arriving at this conclusion, the Supreme Court explained:

> The Court of Appeals held that the "written explanation" provision in § 35(12) is applicable only to prisoners serving indeterminate sentences. We find nothing in § 35 remotely suggesting that parolable life prisoner interviews are excluded from the requirements detailed in subsection 12, and the parole board has not offered any compelling reasons why it should be so construed. Moreover, in addition to protecting a petitioner's statutory right to a written explanation, the need for a written explanation providing reasons for a parole decision is necessary in order to facilitate judicial review as provided for in § 34(8). *Accordingly, we hold that individuals serving parolable life terms and denied parole are statutorily entitled to a sufficiently detailed written explanation for the board's decision and, where appropriate, "specific recommendations for corrective action the prisoner may take to facilitate release."* MCL 791.235(12); MSA 28.2305(12).
>
> We conclude that the Court of Appeals remand in the instant case was well within its authority, although its cited justification for the remand was in error. *Our holding today is narrow: Our decision is not based, as the Court of Appeals erroneously concluded, on a constitutional right to a written explanation; rather, it is simply an incident of the right to a written explanation expressly provided for in MCL 791.235(12); MSA 28.2305(12), and implicitly provided for in MCL 791.234(8); MSA 28.2304(8).* Moreover, the parole board is not required to provide extensive findings of fact and conclusions of law, nor do we insist upon legal opinions when it denies or grants a life prisoner parole. Rather, the board should simply indicate what it

relied on in reaching its decision.[7] [*Glover, supra* at 523-525 (emphasis supplied).]

In applying this reasoning to the facts in *Glover*, the Supreme Court noted that there was both positive and negative evidence about the appellant's "adjustment, attitude and behavior," and because the record was not one-sided, the Parole Board needed to provide a greater explanation for its decision in order to

---

[7] In a concurring opinion in *Glover*, Justice TAYLOR, with whom Justice CORRIGAN concurred, relied on MCR 7.104(D)(7) to arrive at the same result as the majority:

I agree with the result and reasoning of the majority opinion with the exception of its holding that [the appellant] had a statutory right to a written explanation pursuant to MCL 791.235(12); MSA 28.2305(12). I do not find it necessary to reach this disputed issue, as I believe we should affirm the remand ordered by the Court of Appeals on the basis of MCL 791.234(8); MSA 28.2304(8), [which provides that a prisoner's release on parole is discretionary with the parole board, but is also appealable to the circuit court] and MCR 7.104(D)(7). This court rule provides:

"On timely motion by a party, or on the court's own motion, the court may remand the matter to the parole board for an explanation of its decision."

The Legislature has implicitly chosen in MCL 791.234(8); MSA 28.2304(8) to give a reviewing court the ability to request a written explanation should it deem further explanation necessary. Furthermore, MCR 7.104(D)(7), which echoes in part the legislation, provides a procedure for a reviewing court to invoke. [*Glover, supra* at 528 (TAYLOR, J., concurring).]

Yet, the majority addresses this analysis in a footnote in the majority opinion, stating:

The concurring opinion's reliance on MCR 7.104(D)(7) does not resolve whether a petitioner is entitled to a written explanation at the time of the board's decision, and whether such explanations must be routinely furnished. By its very terms, MCR 7.104(D)(7) is a discretionary rule ("the court may . . .") designed to assist the decisional process employed by the circuit court, the Court of Appeals, and this Court. [*Glover, supra* at 524, n 21.]

carry out the Legislature's directive in subsections
35(12) and 34(8). *Glover, supra* at 525-526, & n 22.

VI. ANALYSIS

A. WRITTEN EXPLANATION

In these consolidated appeals, the prisoners main-
tain that they are entitled to a written explanation
from the Parole Board of the reasons why they were
not advanced to the next stage of the parole process.
The prisoners rely on the Supreme Court's language
in *Glover* that "[w]e find nothing in § 35 remotely sug-
gesting that parolable life prisoner interviews are
excluded from the requirements detailed in subsec-
tion 12, and the parole board has not offered any
compelling reasons why it should be so construed."
*Glover, supra* at 523-524. On the basis of this lan-
guage, the prisoners conclude that to the extent that
*Johnson* can be read to deny a statement of reasons
to an inmate serving a parolable life sentence who is
subject to an adverse action of the Parole Board, it is
overruled by *Glover*. The prisoners interpret *Glover* to
mean that a prisoner is entitled under subsection
35(12) to an explanation at any stage in the parole
process that concludes with the Parole Board expres-
sing no interest in advancing the prisoner further
along in the parole process. Each "no interest" deci-
sion, according to the prisoners, is a denial of parole
that requires the Parole Board to state its reasons. We
reject such a broad interpretation of *Glover*.

Clearly, *Glover* stands for the principle that subsec-
tion 35(12) applies to parolable lifers as well as pris-
oners serving indeterminate sentences. *Glover, supra*
at 523-524. However, in *Glover*, the question before
the Supreme Court was not whether an inmate serv-

ing a parolable life sentence, after being interviewed, is entitled to a written explanation of a decision of no action; rather, the question before the Court was whether an inmate serving a parolable life sentence, who has proceeded through the statutory interview, has avoided an objection from the sentencing judge or the successor judge, and has proceeded through a public hearing, is entitled to a written explanation of the reason that the Parole Board denied parole. In *Glover*, the Supreme Court was not addressing a prisoner's rights after the initial interview, but after a public hearing, and determined that at this point the prisoner is entitled to a written explanation pursuant to subsection 35(12), and thus the facts in *Glover* and *Johnson* are distinguishable. See *Altairi v Alhaj*, 235 Mich App 626, 632-633; 599 NW2d 537 (1999) (discussing a previous Court of Appeals decision, this Court stated that "[t]he broad language of the . . . Court's formulation should be interpreted within the factual context of the case" and concluded that where the Court appeared to make a holding pertaining to circumstances not present, the holding is dictum). However, it is not addressed in *Glover* whether a prisoner denied advancement at the front end of the subsection 34(6) "process" is also entitled to the written explanation under subsection 35(12). Thus, the answer to the precise question before us was not addressed in *Glover*, and we must answer it. In order to do so, we must construe subsection 35(12).

Subsection 35(12) provides:

> When the parole board makes *a final determination not to release a prisoner*, the prisoner shall be provided with a written explanation of the reason for denial and, if appropriate, specific recommendations for corrective action the prisoner may take to facilitate release. [Emphasis supplied.]

The Legislature expressly limits the written explanation requirement to "a final determination not to release a prisoner." This phrase is ambiguous because in the context of the eligibility for parole of an inmate serving a parolable life sentence, it could mean the ultimate determination of the Parole Board after the prisoner has advanced through the entire subsection 34(6) process, as in *Glover*, or it could mean any other decision or determination, such as the Parole Board's decision of "no interest" in taking action or a judge's objection. Although, arguably, a prisoner would consider a notice indicating "no interest" in taking action as the equivalent of "denying parole," we believe that the inclusion of the word "final" in subsection § 35(12) demonstrates that the Legislature recognized that the steps in the lifer parole process led to a "final determination" and purposefully limited the written explanation to apply only in that circumstance. Where "effect should be given to every phrase, clause, and word in the statute," *Sun Valley*, *supra* at 237, we conclude that there is no reason for the Legislature to say "final determination" unless that determination is distinguishable from some other determination. Because our Legislature has considered parole for both prisoners serving indeterminate sentences and those serving parolable life sentences and has legislated that a more burdensome process must be undertaken and survived by a lifer to be paroled,[8] see subsection 34(6), we conclude that the Legislature focused the duty to provide a written

---

[8] As the *Glover* Court explained in a footnote:

Subsections 1 to 5 of § 34 apply to inmates who are serving sentences which contain a minimum term, i.e., indeterminate sentences; subsection 6 applies to inmates serving parolable life terms, and establishes a more stringent set of procedures that such

explanation at the point of a final parole decision after proceeding through the statutory process, rather than burdening the parole system with additional work where the Parole Board's "decision" on the initial interview is not even appealable, as hereafter discussed. Moreover, our Supreme Court noted in *Glover* that "the need for a written explanation providing reasons for a parole decision is necessary in order to facilitate judicial review as provided for in § 34(8)." *Glover, supra* at 524. As such, the Supreme Court noted the importance of a written explanation for appellate review, which does not occur unless parole is denied.[9]

### B. APPEALABILITY

The second common issue in these consolidated appeals is whether the Parole Board's decision of "no interest" is appealable. The prisoners maintain that the *Glover* Court's interpretation of subsection 34(8) creates judicial review rights with respect to all adverse parole decisions, including the decision not to proceed to a public hearing. Thus, the prisoners argue that to the extent that *Glover* states that all

---

inmates must successfully navigate to be granted parole. [*Glover, supra* at 523, n 18.]

[9] We also note that the Legislature continues to further limit the rights of an inmate serving a parolable life sentence. For example, effective March 10, 2000, subsection 34(6)(a) provides that a prisoner will be interviewed by the Parole Board after serving ten years of a sentence, and "thereafter as determined by the parole board," unlike the previous version that provided the ten-year interview and an interview "every 5 years thereafter." Now, a prisoner's file is reviewed every five years rather than the prisoner being interviewed every five years. Also, the statutory provision addressing appealability, then subsection 34(8) [now subsection 34(9)], eliminates the right of a prisoner to appeal a denial of parole.

adverse decisions are appealable, it implicitly over-rules *Johnson.*

With regard to appealability, subsection 34(8)[10] then provided in pertinent part:

> [A] prisoner's release on parole is discretionary with the parole board. The action of the parole board *in granting or denying a parole* is appealable by the prisoner, the prosecutor of the county from which the prisoner was committed, or the victim of the crime for which the prisoner was convicted. The appeal shall be to the circuit court in the county from which the prisoner was committed, by leave of the court. [Emphasis supplied.]

Some confusion exists surrounding appealability where the *Glover* Court, after noting that the Parole Board's jurisdiction is governed by § 34, made the following statement regarding appealability: "As explained above, § 34(8) expressly creates judicial review rights with respect to all parole decisions, providing both parolable lifers and those inmates serving indeterminate sentences a right of appeal by leave to the circuit court from adverse decisions by the parole board." *Glover, supra* at 523. From this statement, it can be argued that *all* parole decisions are appealable. However, in making this statement, the Supreme Court makes no analysis of the statutory language "in granting or denying a parole." Moreover, because appealability was not an issue in *Glover*, this statement is dictum.[11] Unlike the *Glover* Court, the *John-*

---

[10] This statutory language, as amended, is now found in subsection 34(9). See 1999 PA 191.

[11] See *People v Puertas*, 462 Mich 885, 895-896; 613 NW2d 297 (2000) (CAVANAGH, J., concurring in part) (" 'Dicta' is an opinion 'which do[es] not embody the resolution or determination of the specific case before the court.' Black's Law Dictionary [6th ed], p 454.").

*son* Court specifically addressed appealability and provided the following interpretation of subsection 34(8):

> We note that the statute unequivocally forbids the granting of parole to any prisoner who fails to overcome any of the statutory hurdles. See MCL 791.234(6); MSA 28.2304(6); see also *Hurst, supra* at 164. Until all the statutory conditions are met, the Parole Board lacks the discretion to parole a prisoner. An appeal from any such failure would be futile because the statute clearly predetermines the outcome: "parole shall not be granted" to any prisoner—such as plaintiff—who does not overcome the interview, hearing, and objection hurdles. See MCL 791.234(6); MSA 28.2304(6). [*Johnson, supra* at 25-26.]

Pursuant to *Johnson*, only the ultimate decision to grant or deny parole of an inmate serving a parolable life sentence is appealable. Because the *Glover* Court's statement regarding appealability is dictum and because *Glover* did not implicitly overrule *Johnson*, this Court is bound by *Johnson* and its holding regarding appealability. MCR 7.215(I)(1).

VII. APPLICATION TO THE PRESENT CONSOLIDATED APPEALS

Petitioners herein, inmates serving parolable life sentences, are not entitled to a written explanation for the Parole Boards' decisions of "no interest" in taking further action because those are not final decisions for which subsection 35(12) requires a written explanation. Nor are the inmates entitled to appeal the decision of "no interest" because none of them progressed through all the steps in the parole eligibil-

ity process to the point where an appealable "ultimate decision" to grant or deny parole was rendered.[12]

### VIII. OTHER STATUTORY REQUIREMENTS
#### (*CESPEDES v PAROLE BOARD*)

On appeal, Cespedes presented an alternative argument for affirming the trial court's decision[13] remanding the matter to the Parole Board for an articulation of reasons,[14] that being that the Parole Board failed to adhere to statutory requirements under § 34, subsection 8.[15] The Legislature amended § 34 in 1998,[16] by

---

[12] Vargas also argues that an inmate serving a parolable life sentence who is under consideration for parole has due process rights in the parole proceedings. To the extent that Vargas' argument is based on the federal constitution, it must fail. *Glover, supra* at 520-521. This Court declines to reach the issue whether the Michigan Constitution confers greater due process rights on parolable life prisoners than the federal constitution, see *id.* at 522, because Vargas failed to present an argument that a compelling reason justifies that interpretation, *id.* See *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999) ("It is axiomatic that where a party fails to brief the merits of an allegation of error, the issue is deemed abandoned by this Court" and "where a party fails to cite any supporting legal authority for its position, the issue is deemed abandoned.").

[13] "[A]n appellee need not file a cross appeal in order to argue an alternative basis for affirming the trial court's decision, even if that argument was considered and rejected by the trial court." *Kosmyna v Botsford Community Hosp*, 238 Mich App 694, 696; 607 NW2d 134 (1999), citing *Middlebrooks v Wayne Co*, 446 Mich 151, 166, n 41; 521 NW2d 774 (1994); *In re Herbach Estate*, 230 Mich App 276, 284; 583 NW2d 541 (1998); see also *People v Hackett*, 460 Mich 202, 212, n 3; 596 NW2d 107 (1999).

[14] We decline to address the Parole Board's argument regarding at what point parole guidelines must be prepared because Cespedes made no such argument, and thus to address the argument would be to address an issue not in controversy.

[15] Note: 1998 PA 314 added a new subsection designated subsection 7 of MCL 791.234, which was renumbered to subsection 8 in the amendments made by 1999 PA 191. Thus, the subsection 8 on which Cespedes relies in this argument is found in a later version of the statute and is not the same as the subsection 8 that the *Glover* Court cited. The amended version of the subsection 8 discussed in *Glover* is currently found, as amended, in subsection 9.

[16] See 1998 PA 314, MCL 791.234(7).

adding a subsection, specifically applicable to a prisoner convicted of violating or conspiring to violate MCL 333.7401(2)(a)(i) and sentenced to life imprisonment before October 1, 1998, such as Cespedes. That subsection provides in relevant part that in determining whether a prisoner convicted of violating MCL 333.7401(2)(a)(i) and sentenced to life imprisonment before October 1, 1998, is to be released on parole, a number of factors addressing the gravity of the offense "shall" be considered.[17] Because we found

---

[17] The relevant portion of § 34, now subsection 8, provides in full:

(8) In determining whether a prisoner convicted of violating or conspiring to violate section 7401(2)(a)(i) of the public health code, 1978 PA 368, MCL 333.7401, and sentenced to imprisonment for life before October 1, 1998 is to be released on parole, the parole board shall consider all of the following:

(a) Whether the violation was part of a continuing series of violations of section 7401 or 7403 of the public health code, 1978 PA 368, MCL 333.7401 and 333.7403, by that individual.

(b) Whether the violation was committed by the individual in concert with 5 or more other individuals.

(c) Any of the following:

(i) Whether the individual was a principal administrator, organizer, or leader of an entity that the individual knew or had reason to know was organized, in whole or in part, to commit violations of section 7401 or 7403 of the public health code, 1978 PA 368, MCL 333.7401 and 333.7403, and whether the violation for which the individual was convicted was committed to further the interests of that entity.

(ii) Whether the individual was a principal administrator, organizer, or leader of an entity that the individual knew or had reason to know committed violations of section 7401 or 7403 of the public health code, 1978 PA 368, MCL 333.7401 and 333.7403, and whether the violation for which the individual was convicted was committed to further the interests of that entity.

(iii) Whether the violation was committed in a drug-free school zone.

(iv) Whether the violation involved the delivery of a controlled substance to an individual less than 17 years of age or possession with intent to deliver a controlled substance to an individual less than 17 years of age.

no case law interpreting this subsection, nor did Cespedes cite any, we must interpret this subsection to determine whether remand to the Parole Board was appropriate in *Cespedes*.

Cespedes argues that pursuant to the statute, the Parole Board must consider the criteria listed in this provision, because the statutory language provides that "the parole board *shall* consider all of the following: . . . ." MCL 791.234(8) (emphasis supplied). In a statute, use of the word "shall" indicates a mandatory action. *Adams v Linderman*, 244 Mich App 178, 184; 624 NW2d 776 (2000). Thus, Cespedes is correct in asserting that the Parole Board is required to consider these criteria.

Cespedes continues by arguing that "[e]ven a casual reading of the statutory criteria demonstrates a clear Legislative intent to impose a duty on the parole board to determine whether the prisoner seeking parole was a major or minor player in the drug trade." Cespedes concludes that the Parole Board's notice of action, which states that it has reviewed his case after the March 3, 1999, interview and "[b]ased upon the seriousness of the offense, the large amount of cocaine seized, and your institutional conduct, the parole boards [sic] takes no interest in parole at this time," fails to touch on the statutory requirements and makes meaningless the reasons that the Legislature removed drug offenses involving more than 650 grams from the nonparolable category.

However, Cespedes fails to address why this statutory requirement must be accomplished at the time of the initial interview rather than at a later time in the parole process for inmates serving life sentences. A closer look at the statutory language reveals that the

Legislature indicated when the criteria at issue should be considered:

> *In determining whether a prisoner* convicted of violating or conspiring to violate section 7401(2)(a)(i) of the public health code, 1978 PA 368, MCL 333.7401, and sentenced to imprisonment for life before October 1, 1998 *is to be released on parole,* the parole board *shall* consider all of the following: . . . . [MCL 791.234(8).]

The statutory language clearly indicates that the consideration must occur when determining whether the prisoner in question "is to be released on parole." Thus, the question becomes when does the Parole Board determine whether a prisoner should be released on parole?

Judicial construction is necessary here because this phrase is ambiguous. This Court has explained:

> " '[A]mbiguous statutes are to be interpreted as a whole and construed so as to give effect to each provision and to produce a harmonious and consistent result. Specific words in a given statute are to be assigned their ordinary meaning, unless a different interpretation is indicated. *Erickson v Dep't of Social Services,* 108 Mich App 473; 310 NW2d 428 (1981).' " [*Niggeling v Dep't of Transportation,* 183 Mich App 770, 775; 455 NW2d 415 (1990), quoting *Young v Michigan,* 171 Mich App 72, 77; 429 NW2d 642 (1988), quoting *Action Auto, Inc v Anderson,* 165 Mich App 620, 628; 419 NW2d 36 (1988).]

In light of *Johnson, supra,* we hold that the "release" decision occurs only after the inmate serving a parolable life sentence has proceeded through the initial interview, avoided judicial veto, and advanced through a public hearing to the ultimate decision of the Parole Board, at which time the Parole Board either grants or denies parole. In other

words, in light of this Court's analysis in *Johnson*, the statutory language "[i]n determining whether a prisoner . . . is to be released on parole" can only refer to the Parole Board's determination made at the end of the parole process for inmates serving life sentences. Until that point, there is no appealable decision. *Johnson, supra.* Moreover, at that point, the prisoner is entitled to a sufficient written explanation of a denial of parole. *Glover, supra.* Consequently, we conclude that the considerations found in subsections 34(8)(a) to (c) need not be made until after the lifer has proceeded through the parole eligibility process to the point where the Parole Board makes the final determination regarding release of the prisoner.

## IX. CONCLUSION

None of the inmates in these consolidated appeals are entitled to a written explanation of the Parole Board's decisions of "no interest" in taking further action, nor are those decisions appealable. Further, the Parole Board need not address the factors in subsection 34(8) until Cespedes has advanced through the parole process to the point where the Parole Board makes the final determination whether to release him, i.e., at the point where the Parole Board considers whether to grant or deny parole. Thus, we affirm the circuit court's denial of leave to appeal in *Vargas* and we reverse the circuit courts' grants of appeal and remands for written explanations in *Gilmore* and *Cespedes.*

*Gilmore v Parole Board,* reversed

*Vargas v Parole Board,* affirmed.

*Cespedes v Parole Board,* reversed.